## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **Maria Fontenelle,** | ) | |
| **ex rel., M.S., a minor,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 1111** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Maria Valdez** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM, OPINION AND ORDER</u>

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Maria Fontenelle's claim for Supplemental Security Income Benefits under title XVI of the Social Security Act. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons contained herein, Plaintiff's Motion for Summary Judgment [Doc. No. 48] is granted in part and denied in part. The Court finds that this matter should be remanded for further proceedings consistent with this order.

## BACKGROUND

**I.      Procedural History**

Fontenelle originally applied for Supplemental Security Income ("SSI") disability benefits on behalf of her minor child M.S. on June 13, 2006. (R. 12.) The claim was denied on September 16, 2006, and upon reconsideration on November 20, 2006. (*Id.*) Fontenelle filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on July 16, 2008. (*Id.*) Fontenelle and M.S. personally appeared, and M.S. testified at the hearing. (*Id.*) M.S. was represented by counsel. (*Id.*)

On August 28, 2008, the ALJ denied Fontenelle's claim for benefits and found the minor child not disabled under the Social Security Act. (R. 21-22.) The Social Security Administration Appeals Council denied Fontenelle's request for review on December 23, 2008, (R. 1), leaving the ALJ's decision as the final decision of the Commissioner. The final decision of the Commissioner is reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    Factual Background[1]

### A.    M.S.'s History

M.S. was born on November 3, 1995. (R. 14.) At the time of the ALJ hearing he was twelve years old. (*Id.*) He attends school, and at the time of the hearing, he was about to enter seventh grade. (*Id.*) When he was two years old, he was diagnosed with asthma. (R. 276.) At the age of three, M.S. was diagnosed with attention deficit hyperactivity disorder ("ADHD") and was prescribed Ritalin. (R. 283.) Due to some side effects, he was taken off the drug. (*Id.*) He attended Melrose Park Elementary School from the time he was in Kindergarten until he finished his fourth grade year. (*Id.*) In second grade, he was put back on Ritalin. (*Id.*) M.S. attended Stevens School during the time he was in fifth grade and sixth grade. (R. 283, 296.) At the time of the hearing, he was preparing to start seventh grade. (R. 28.) In addition to Ritalin, M.S. has been prescribed Prozac (R. 131), Advair Diskus (R. 313), Methlyn (R. 144), Albuterol (*Id.*), singulair (*Id.*), and a nebulizer. (R. 131.)

Fontenelle claimed disability on behalf of M.S. beginning on June 13, 2006, because of asthma and attention deficit hyperactivity disorder ("ADHD"). (R. 106, 129.)

---

[1] Defendant argues that a substantial portion of the evidence currently in the record (R. 146-93, and 330-50) was submitted to the Appeals Council but was not part of the record before the ALJ. The record reflects as much. (R. 4.) As such, this Court may not consider this evidence on substantial evidence review of the ALJ's decision.

**B.** **Testimony, medical evidence and school records**

*1. M.S.'s testimony*

At the hearing, M.S. testified that he was in special education math and reading classes, and stated that he attended them every day. (R. 28-29.) He reported that he was doing "good" in school, but did not remember what kind of grades he received his last school year. (R. 29.) He said that he was "pretty good" at finishing things that he is given to do, but that somebody has to help him and sit with him to keep his mind on his work. (R. 30.) M.S. said that his mom and sisters help him study. (R. 34.)

In terms of his asthma, M.S. claimed that he uses his inhaler and his "machine" when he needs it. (R. 29.) He reported that he was able to play games, participate in recess and gym at school, and keep up with the rest of the class. (R. 31.) He said that he could shoot baskets and play ball. (*Id.*) He also said that he picked out his own clothes, brushed his teeth and washed his face, but that he had to be reminded to do those things. (R. 32.) M.S. reported that his asthma kept him from doing very much, and that it bothered him a lot. (*Id.*) He explained that he had been to the hospital or emergency room recently for his asthma, but could not remember when. (*Id.*) He said that he has to take medicine every day. (R. 34.) He also said that he sometimes has trouble with breathing on "regular old day[s]" or "when [he] is kind of around the house." (*Id.*) When that happens, M.S. said that he uses his pump. (*Id.*)

2.    *Medical Evidence*

The record contains two Social Security Administration childhood disability evaluations: (1) a September 1, 2006 evaluation by David Brister, Ph.D., (R. 238-43); and (2) a November 16, 2006 evaluation by Erika Altman, Ph.D., (R.248-253).

Dr. Brister concluded that M.S. had less than marked limitation in attending and completing tasks, and no limitations in acquiring and using information, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being. (R. 240-41.) Explaining his findings, Dr. Brister said that M.S. had a "history of DCFS involvement, but apparently lives with the mother. The child is a physically healthy young man with a history of ADHD and appears to responding *(sic)* to current treatment. The claimant does not appear to meet/equal/or functionally equal a listing." (R. 243.) Dr. Brister indicated that his sources were reports from Dr. Alexander, Dr. Yunez and Dr. Langgut. (*Id.*)

Dr. Altman affirmed Dr. Brister's determination and concluded that M.S. had less than marked limitation in attending and completing tasks, and no limitations in acquiring and using information, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being. (R. 250-51.) Dr. Altman reported that "claimant is a 10 year old male attending regular classes at Melrose Park Elementary school. Dx and treatment for ADHD and asthma. . . . Impairment severe but does not meet, medically equal or functionally equal any listing." (R. 253.) Dr. Altman indicated that his sources were

5

a reports from Family Medical Center, Dr. Yunez, Dr. Alexander, and Dr. Langgut. (*Id.*)

The record also contains a number of reports and progress notes from M.S.'s examining physicians. On September 2, 2005, Dr. Karim Yunez completed a Physician's Report for M.S.'s school. (R. 201.) Dr. Yunez noted that M.S. was diagnosed with ADHD and had been prescribed Ritalin. (*Id.*) The doctor explained that the medication is needed during the school day to increase concentration and decrease hyperactivity. (*Id.*) Dr. Yunez completed an identical form on August 29, 2006. (R. 235.) On July 23, 2007, Dr. Yunex wrote M.S. a prescription that explained that M.S. has exercise-induced asthma; the note stated that M.S. "should avoid running in gym at all costs." (R. 260.) Dr. Yunez also prescribed Advair Diskus for M.S.'s asthma. (R. 313.)

On December 19, 2005, a CT scan of M.S.'s abdomen and pelvis revealed no sings of acute appendicitis, liver lesions or splenic lesions, and no pancreatic or adrenal abnormalities. (R. 213.) The scan also showed that both kidneys "enhance normally and are without hydronephrosis." (*Id.*) The scan did reveal that there were "infiltrates or atelectasis in the left lung base and possibly in the right middle lobe medially." (*Id.*)

On August 15, 2006, just before M.S. started fifth grade, Dr. Mark Langgut completed a Report of Psychological Assessment. (R. 326.) Dr. Langgut noted that when M.S. started preschool at age three, he had behavioral problems. (R. 327.) The doctor found that M.S. has persistent difficulties in science, and that he does not

receive special education services. (*Id.*) Dr. Langgut also reported that M.S. fights with his peers, does not share, and is overactive and impulsive. (*Id.*) In terms of M.S.'s asthma, Dr. Langgut said that he was hospitalized at age four for his condition, and that he uses albuterol and Singulair. (*Id.*) The doctor also noted M.S.'s use of Ritalin and noted that M.S. saw a social worker at his school for counseling. (*Id.*) During the examination, M.S. reported depression of mild intensity. And anxiety of mild intensity regarding his schoolwork. (*Id.*) Dr. Langgut also reported that M.S. gave evidence of variable memory skills: "[h]e was able to remember five digits forward and three digits but did so in a slow, plodding manner, indicating somewhat impaired immediate recall ability." (*Id.*)

In a September 21, 2006 progress note, Dr. Michelle Alexandre prescribed a nebulizer for M.S., in addition to his albuterol inhaler and methylin. (R. 237.) In a September 25, 2006 progress note, Dr. Alexandre limited M.S.'s gym class activity and instructed him to continue to use his albuterol inhaler. (*Id.*)

On September 19, 2007, Dr. Vahideh Nilforoshan sent a letter to M.S.'s school and requested that M.S. be allowed to "carry and administer his Albuterol inhaler every 4 hours for the next 2 days, to pre-medicate for sports/gym, and as needed for symptoms thereafter." (R. 308.) On the same date, after M.S. had been in the hospital for three days due to wheezing, abdominal pain, nausea and vomiting, Dr. Nilforoshan completed a pediatric discharge summary and noted that "[M.S.] has a history of hospitalizations for his asthma, mom states up to 4 times per year (at least 3 admits/year since dx at age 4). He has never been in the PICU and never

been intubated. Most revent hospitalization prior to this one is Nov '06." (R. 309.)

Dr. Nilforoshan also reported that M.S. required one hour of continuous

albuterol/atrovent, "and was then on Q2 albuterol through his first 24 hrs of

admission. He also required oxygen for the first day, with desats to the high 80s on

room air on admission." (R. 310.) During his stay at the hospital, a chest x-ray was

done which showed "LLL atelectasis vs pneumonia." (*Id.*) M.S.'s discharge diagnosis

was "acute asthma exacerbation." (*Id.*) Dr. Nilforoshan notes no activity

restrictions, and said that there is no reason for M.S. to avoid gym unless he is

having respiratory distress. (*Id.*) The doctor also said that M.S. should pre-medicate

with albuterol prior to exercise. (*Id.*)

3.   *School Records*

On August 7, 2006, a facsimile sent in response to a request for M.S.'s

educational records, states the following: "Not special Ed. Have no Information."[2]

(R. 229.)

On December 13, 2006, Alicia Mahoney, Coordinator at Stevenson School,

sent a letter to Fontenelle explaining that M.S. was referred for an evaluation by

the Child Study Team because of academic concerns. Ms. Mahoney explained that

M.S. continued "to struggle in most academic areas with interventions and

modifications in place." (R. 281.)

---

[2] The record suggests that the facsimile came from Melrose Park Elementary School
and was written by a "Rose Fuentes." (R. 228-29.)

A Spring 2007 Illinois Student Report shows that M.S.'s scaled score in writing was "17," "which is at the Below Standards performance level." (R. 279.) The report states that the "Below Standards" performance level indicates that "[s]tudent work demonstrates basic knowledge and skills in the subject. However, because of gaps in learning, students apply knowledge and skills in limited ways." (*Id.*)

On March 26, 2007, a Psychological Report was completed after M.S. was referred for a full case study evaluation by the Child Study Team at Stevenson School. (R. 283.) The report notes that M.S. "continues to be struggling in his classes." (*Id.*) The report states that M.S.'s full scale IQ score was within the average range.

An Individualized Education Program ("IEP") Conference regarding M.S. was held on April 5, 2007. (R. 275.) The purpose of the conference was to establish an IEP for M.S. and to determine if M.S. was eligible for special education services. (*Id.*) The summary of the conference's case study components states that M.S.'s "attention to task is still a problem. His daily living skills are age appropriate. His peer relationships are not a concern. His self help skills are age appropriate, except in homework completion, and assuming some responsibilities at home." (R. 276.) The conference determined that M.S. was eligible for special education and related services, and found M.S. to be learning disabled. (R. 277.)

An IEP meeting regarding M.S. took place on October 23, 2007, when M.S. was in sixth grade. R. 290.) The report of the meeting showed that M.S. was

performing at a third grade level in letter-word identification, a fourth grade level in passage comprehension, written expression and spelling, and a fifth grade level in calculation and math application. (R. 290.) In terms of educational needs, the report states that M.S. has educational needs in the areas of reading, writing and math. (R. 298.) The report recommended that M.S. spend fourteen percent of his time in special education services. (R. 299.)

The IEP meeting report also showed that M.S. was to be accommodated in a number of ways in the classroom. (R. 292.) his teachers were instructed to do the following: give directions in small, distinct steps; give directions both in writing and verbally; show samples as models; teach to student's learning style (visual); provide small group instruction; model lesson being taught; allow the use of special equipment (calculator); provide assignment sheet or planner; communicate homework expectations with parents; pre-teach vocabulary; check student's lesson comprehension; provide study guides; provide a study buddy; notify special education teacher when grade drops below "C"; seat next to a good role model. (*Id.*) The report also suggested the following testing accommodations: use of calculators as allowable; modifications in test time (up to twice the original time); staff member reads contents of test; modification in test site; modification/change in the language of the directions; staff member monitors correct Scantron completion. (*Id.*) The report also noted that M.S.'s "visual motor integration skills . . . are significantly below expectations. His errors herein are lack of integration of parts. A deficit in

this area could cause him to have difficulty copying from the board or a book, tracking, or writing." (R. 294.)

In a Report of Progress on Annual Goal form dated November 8, 2007, Ms. C. Hussman noted that M.S. was making progress in applying vocabulary and fomulas to solve problems and composing sentences that have meaning, correct punctuation and grammar. (R. 288.) The report also noted that M.S. was not making progress in using decoding strategies to read unfamiliar words. (*Id.*)

An undated note documenting a meeting held regarding M.S.'s progress stated that M.S. had "[p]roblems completing work on time. Needs to work on organizational skills." (R. 286.)

C.    **ALJ Decision**

The ALJ found that M.S. had never engaged in substantial gainful activity. (R. 15.) The ALJ determined that M.S. had the following severe impairments: asthma and ADHD. (*Id.*) However, the ALJ found that these conditions did not meet or medically equal any listed impairments. (*Id.*) Specifically, the ALJ found that M.S. did "not have the repeated exacerbations required to meet Listing 103.03 relating to asthma, for which he is on Advair, Albuterol, Singulair, and a Nebulizer." (*Id.*) The ALJ also explained that M.S. reported no side effects from his medications, that M.S. takes gym for 15-20 minutes, and that M.S. "said he was doing ok." (*Id.*) In terms of M.S.'s asthma, the ALJ concluded that it is "apparently under cnotrol enough that it does not produce disabling functional limitations that

are the same as the disabling functional limitations of a Listing with similar episodic criteria." (*Id.*)

In terms of M.S.'s ADHD, the ALJ stated that M.S. "was not in special education in Melrose Park Elementary school, but now is considered learning disabled." (*Id.*) He also stated that testing revealed that M.S. has an average IQ, but that he is behind in reading. (*Id.*) The ALJ claimed that M.S. was progressing, and was in the 7th grade, "which is about right for a 12 year old child." (*Id.*)

In considering the six functional domains, the ALJ found that M.S. did not have an impairment or combination of impairments that functionally equaled the listings. (*Id.*) Specifically, the ALJ found that M.S. had a less than marked limitation in acquiring and using information because M.S. was progressing, was in the right grade for his age, has an average IQ, and "was not in special education, although he [was] behind in reading." (R. 17.) The ALJ also found that M.S. had a less than marked limitation in attending and completing tasks; the ALJ explained that a "Report shows claimant making progress in November, 2007." (R. 18.)

The ALJ determined that M.S. had no limitation in interacting and relating with others, in moving about and manipulating objects, and in caring for himself. (R. 18-21.) The ALJ also determined that M.S. had a less than marked limitation in health and physical well-being; the ALJ explained that M.S. does feel bad that asthma prevents his participation in sports. (R. 21.)

Since M.S.'s conditions did not meet, medically equal or functionally equal a listing, the ALJ ruled that M.S. was not disabled under the Social Security Act. (R. 21.)

## DISCUSSION

### I.     ALJ Legal Standard

Under the Social Security Act, a child is disabled if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). In order to determine whether a child is disabled, the ALJ employs a three-step analysis. 20 C.F.R. § 416.924(a). First, a child engaged in substantial gainful activity will not be considered disabled, and the claim will be denied. *Id.* Second, if the child does not have a physical or mental impairment or combination of impairments that is severe, his claim will be denied. *Id.* Third, unless the child's impairment meets, medically equals, or functionally equals one of the listings of impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 his claim will be denied. *Id.*

To determine whether an impairment functionally equals one of the listings, the ALJ evaluates its severity in six functional domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). In order for an

impairment to be functionally equivalent to a listing, the ALJ must find a "marked" limitation in two domains or an "extreme" limitation in one domain. §416.926a(a).

## II.     Judicial Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony on the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v.*

*Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.  Analysis

Plaintiff argues that the ALJ's decision was in error for the following reasons: (1) the ALJ's credibility determination was erroneous; (2) the ALJ failed to consider evidence in light of the requirements of relevant listed impairments; and (3) the ALJ failed to consider evidence in his determination that M.S.'s impairments did not functionally equal a listed impairment.

### A.  <u>Credibility</u>

Plaintiff's complaints regarding the ALJ's credibility conclusion are well taken. The ALJ's credibility determination consists of inadequate boilerplate:

> While claimant's medically determinable impairments could reasonably be expected to produce some symptoms; that statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding

15

> that the claimant does not have an impairment or combination of impairments that functionally equals the listings.

(R. 16.) In a recent decision, the Seventh Circuit reiterated that such a "template" amounts to "meaningless boilerplate." *Bjornson v. Astrue*, ___ F.3d ___, 2012 WL 280736, at *4 (7th Cir. Jan. 31, 2012) (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). Such language "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that the claimant's complaints were not credible." *Id.* (quoting *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). Defendant claims that the ALJ considered the record evidence and M.S.'s testimony in assessing his credibility. After the boilerplate language, the ALJ did summarize some of M.S.'s testimony, but there is still nothing in his decision that explains how he made his decision about M.S.'s credibility. The only reasoning provided by the ALJ suggests that M.S.'s claims lack credibility at the point at which they are inconsistent with the ALJ's findings, which "implies that [a finding on a claimant's level of impairment] is determined first and is then used to determine the claimant's credibility. That gets things backwards." *Id.*

It is unclear which, if any, of M.S.'s statements, if fully credited, describe (or contribute to the description of) disabling limitations, but the transcript of the hearing does reveal some answers (to the ALJ's questions) that, if believed, could have affected the ALJ's decision. As such, this case must be remanded back to the Commissioner for a full and fair analysis of M.S.'s credibility.

## B.    Listed Impairments

Plaintiff argues that the ALJ failed to evaluate the evidence relating to particular listed impairments. Specifically, Plaintiff contends that the ALJ neglected to consider evidence in light of the medical requirements of listings 103.02(C)(1), 112.11 and 103.03(C)(1).

20 C.F.R. § 416.924 provides that a child's impairment(s) must meet, medically equal or functionally equal a listing in order for the child to be found disabled. 20 C.F.R. § 416.924(d). Pursuant to listing 103.02(C)(1), a child's impairment equals the listing for chronic pulmonary insufficiency if the child has a frequent need for mechanical ventilation. Listing 103.02(C)(1), 20 C.F.R. Pt. 404, Subpt. P, App. 1. While the ALJ did not consider the evidence in light of listing 103.02, there is no evidence in the record that M.S. ever experienced a need for mechanical ventilation, much less a frequent need.

Pursuant to listing 112.11, a child's impairment equals the listing for attention deficit hyperactivity disorder where there is medically documented findings of marked inattention, marked impulsiveness and marked hyperactivity, resulting in at least two of the appropriate age-group criteria in paragraph B2 of listing 112.02. While the ALJ did not explicitly consider the evidence in light of listing 112.11, there is no evidence in the record of medically documented findings of marked inattention, marked impulsiveness and marked hyperactivity.

Pursuant to listing 103.03(C)(1), a child's impairment equals the listing for asthma if the child has a persistent prolonged expiration with radiographic or other

appropriate evidence of pulmonary hyperinflation or peribronchial disease as well as persistent low-grade wheezing between acute attacks or an absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators. Listing 103.03(C)(1), 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ explained that "Claimant does not have the repeated exacerbations required to meet Listing 103.03." (R. 15.) It is apparent that the ALJ improperly read the "frequency of attacks" requirement in section 103.03(B)[3] as a requirement of all subsections. "However, that reading is contrary to the express terms of section 103.03. Section 103.03 is written in the disjunctive, not the conjunctive." *Mayfield v. Barnhart*, No 01 C 9418, 2003 WL 223310, at *8 (N.D. Ill. Jan. 30, 2003). Therefore, "[a] condition of asthma accompanied by evidence of the requirements of section

---

[3] In its entirety, listing 103.03 provides:
    A. $FEV_1$ equal to or less than the value specified in table I of 103.02A; *Or*
    B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks; *Or*
    C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:
    1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
    2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period; *Or*
    D. Growth impairment as described under the criteria in 100.00
Listing 103.03, 20 C.F.R. Pt. 404 Subpt. P, App. 1 (emphases added).

103.03(C) does not also have to meet the frequency of attacks requirement of 103.03(B)." *Id.*

The CT scan showing infiltrates or atelectasis in the left lung base (R. 213) could constitute appropriate evidence of pulmonary hyperinflation or peribronchial disease or its medical equivalent; and the record contains evidence of what might qualify as persistent low-grade wheezing, as well as the absence of symptom-free periods requiring daytime and nocturnal use of bronchodilators. While the determination of whether the evidence in the record meets or medically equals the requirements of the listing is the ALJ's to make, his failure to consider evidence in light of the unmentioned subsections of listing 103.03 suggests that his determination was incomplete. Remand is necessary to remedy the inadequacy. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (finding that remand is required where the ALJ did not provide a sufficient analysis of the Step 3 question since he failed to mention the applicable listing and failed to evaluate evidence favorable to the plaintiff*); Brindisi* ex. rel. *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (finding that the ALJ's failure to discuss the claimant's impairments in conjunction with the listings "frustrate[d] any attempt at judicial review."); *Scott v. Barnhart, 297 F.3d 589, 595* (7th Cir. 2002) (failure to discuss or reference a listing left the court "with grave reservations as to whether his factual assessment adequately addressed the criteria of the listing.").

## C.    **Functional Equivalence**

Plaintiff also argues that the ALJ failed to consider evidence in his determination that M.S.'s impairments did not functionally equal a listing. Plaintiff's argument is well taken. In his decision, the ALJ stated that "[i]n terms of the six domains of function, I considered Exhibits 7F, 9F."[4] (R. 16.) The Court understands this to mean that the ALJ relied solely on Exhibits 7F and 9F for his functional equivalence determination; this alone strongly indicates that his decision was not based upon consideration of all the relevant evidence. A thorough analysis of the ALJ's functional equivalency determination makes this even more clear.

Regarding the domain of acquiring and using information, the ALJ's analysis consists of the following: "Claimant is progressing. He is in the 7th grade which is about right a *(sic)* 12 year old child. He has an average IQ and not *(sic)* in special education, although he is behind in reading." (R. 17.) For the most part, the ALJ only selected and discussed that evidence that favored his ultimate conclusion; he failed to consider a significant amount of evidence. Although M.S. was "making progress" in the subjects of "writing to communicate for a variety of purposes" and "applying vocabulary and formulas to solve math application problems," he was "not making progress" in the subject of "using decoding strategies to read unfamiliar

---

[4] Exhibit 7F is a Social Security Administration Childhood Disability Evaluation Form dated September 1, 2006 that was completed by Dr. Brister. (R. 238-243.) Exhibit 9F is an identical form dated November 11, 2006 that was completed by Dr. Altman. R. (248-253.)

words" and the subject of "applying reading strategies to answer comprehension questions" had not been introduced. (R. 288.)

As of March 20, 2007, M.S.'s "attention to task [was] still a problem." (R. 276.) On December 13, 2006, M.S. was referred for an evaluation by the Child Study Team at Stevenson for "academic concerns"; the reason given for the referral was that "[M.S.] continues to struggle in most academic areas with interventions and modifications in place." (R. 281.) The Spring 2007 Illinois Student Report found that M.S.'s writing score was at the "below standards" performance level. (R. 279.) When M.S. took the Woodcock-Johnson tests of achievement on October 2, 2007, he was in the sixth grade, but his letter-word identification skills were at a third grade level, his passage comprehension, written expression and spelling skills were at a fourth grade level, and his math calculation and application skills were at a fifth grade level. (R. 290.) The ALJ mentioned none of this in his decision.

Furthermore, the ALJ's statement that M.S. was "not in special education" is inaccurate. There is a handwritten note in the record that says, "Not Special Ed. Have no Information." (R. 229.) The record reveals that this information was provided by someone at Melrose Park Elementary School. (R. 228.) It may be the case that M.S. was not in special education at Melrose Park, but M.S. only attended that school from Kindergarten through fourth grade. (R. 283.) M.S. attended Stevenson Elementary School starting when he was in fifth grade. (R. 283.) After teachers found M.S. struggling in most academic areas, a case study / eligibility determination was performed, and the special education coordinator determined

that M.S. was learning disabled, was eligible for special education and related services, and would receive special education and related services. (R. 275-77.) In sixth grade, he spent fourteen percent of his time in special education classes. (R. 296.) Additionally, M.S. received a number of accommodations based upon his learning impairments. (R. 292, 300-01.) Most troubling is the fact that M.S. told the ALJ that he was in special education. In the hearing, the ALJ asked M.S. whether he was in regular classes in school or in special classes; M.S. answered, "[s]pecial." (R. 28.) The ALJ then asked, "Do you know what you're in – what classes are special for you?" (R. 28.) M.S. answered, "[m]ath and reading." (R. 28.) The ALJ then asked, "Are you in those classes every day, math and reading?" (R. 29.) M.S. answered, "[y]es." (R. 29.)

Regarding the domain of attending and completing tasks, the ALJ stated, "Report shows claimant making progress in November, 2007." The progress cited by the ALJ concerned M.S.'s ability to compose sentences that have meaning, correct punctuation and grammar, and his ability to apply proper vocabulary and formulas to math problems; it had nothing to do with attending and completing tasks. (R. 288.) The ALJ failed to mention that documentation of a meeting on M.S.'s progress indicated that M.S. has "problems completing work on time," and "needs to work on organizational skills." (R. 286.) The ALJ also failed to consider that M.S. testified that somebody has to help him and sit with him to keep his mind on his work. (R. 30.) Regarding the domain of interacting and relating with others, the ALJ mentioned none of the evidence in the record and provided no analysis, even though

22

Dr. Langgut reported that M.S. fights with his peers, does not share, and is overactive and impulsive. (R. 327.)

The ALJ found that M.S. had less than marked limitation in health and physical well-being. (R. 21.) The ALJ's analysis consists of one sentence: "[M.S.] does feel bad that asthma prevents his participation in sports." Considering the evidence in the record relating to M.S.'s asthma, and its effect on his health and physical well-being, the ALJ's reasoning is inadequate. The ALJ fails to mention M.S.'s hospitalizations due to asthma, nebulizer treatments, history of physical education limitations, and general asthma symptoms.

The ALJ failed to build an accurate and logical bridge from the evidence to his conclusion. He did not consider evidence in the record that may have impacted his findings. Although the ALJ is not required to provide a written evaluation of every piece of evidence, the ALJ must address all of the relevant evidence in reaching his conclusion. *Herron*, 19 F.3d at 333 ("the ALJ's decision must be based upon consideration of all the relevant evidence" and "the ALJ 'must articulate at some minimal level his analysis of the evidence.'") (internal citations omitted).

The Court concludes that an outright reversal of the ALJ's decision is not appropriate because there is evidence in the record that could support a finding of non-disability. *See McPheron v. Barnhart*, No. 02 C 6261, 2003 WL 22956395, at *17 (N.D. Ill., Dec. 12, 2003). However, remand is necessary so that the ALJ may construct the logical bridge between the evidence and his conclusions. *See id.* The Court expresses no opinion about the decision to be made on remand but encourages

the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)*; Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Plaintiff's Motion for Summary Judgment [Doc. No. 48], and finds this matter should be remanded for further proceedings consistent with this opinion.

**SO ORDERED.**                    **ENTERED:**

**DATE:  February 24, 2012**      _____

                                   **HON. MARIA VALDEZ**
                                   **United States Magistrate Judge**